IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANTHONY T. JACKSON,                      )
                                         )
        Petitioner                       )
                                         )
vs.                                      )     Case No. 19-cv-00822-DWD
                                         )
ALEX    JONES,    Warden,    Menard      )
Correctional Center,                     )
                                         )
        Respondent.                      )

<u>MEMORANDUM & ORDER</u>

**DUGAN, District Judge:**

Before the Court is Petitioner's Petition for Writ of Habeas Corpus (Doc. 1) under

28 U.S.C. § 2254. Respondent filed a Response to the Petition for Writ of Habeas Corpus

(Doc. 13), and the matter is now ripe for a decision by the Court. For the reasons explained

below, the Petition for Writ of Habeas Corpus is **DENIED** and this action is **DISMISSED**

**with prejudice**. The Clerk is **DIRECTED** to enter judgment accordingly.

**Background**

On September 25, 2009, Petitioner was convicted by a jury in Clinton County,

Illinois, of first-degree murder. (Doc. 1, pg. 1). On November 24, 2009, Petitioner was

sentenced to 40 years in prison. (Doc. 1, pg. 1). Petitioner is in the custody of the Illinois

Department of Corrections at Menard Correctional Center and has now filed a *pro se*

Petition for Writ of Habeas Corpus (Doc. 1) under 28 U.S.C. § 2254, alleging: (1) the

Illinois trial court erred by denying Petitioner's motion to suppress statements made

during a custodial interrogation, where he requested but did not receive legal counsel

(Doc. 1, pg. 8); (2) Petitioner received ineffective assistance of counsel in his direct appeal, where counsel failed to challenge the Illinois trial court's grant of a motion *in limine* that barred the presentation of certain testimonial evidence at trial (Doc. 1, pg. 10); (3) Petitioner received ineffective assistance of counsel, where appellate counsel failed to challenge certain witness identification testimony (Doc. 1, pg. 12); (4) Petitioner received ineffective assistance of trial counsel, where counsel failed to call an alibi witness to testify at trial (Doc. 1, pg. 14); and (5) The evidence did not support the judgment and conviction, where hair fragments found on the victim did not match Petitioner's hair samples (Doc. 1, pg. 16). Respondent filed a Response along with the state court record. (Docs. 13-14).

### 1. State of Illinois Trial Court Proceedings

Petitioner was charged with first-degree murder. (Docs. 14-1, pg. 1; 14-3, pg. 2). Petitioner was tried before a jury in Clinton County, Illinois. (Docs. 14-1, pg. 1; 14-3, pg. 2). The State presented evidence consistent with the following summary, which is derived in part from orders of the Illinois Appellate Court, Fifth District, under Illinois Supreme Court Rule 23, when affirming the judgment and conviction on direct appeal and affirming the dismissal of Petitioner's second amended petition for postconviction relief. *See People v. Jackson*, 2011 IL App (5th) 100181-U ("*Jackson I*"); *People v. Jackson*, 2018 IL App (5th) 150090-U ("*Jackson II*"); (Docs. 14-1; 14-3). State court determinations of factual issues are presumptively correct, such that clear and convincing evidence is required to rebut the presumption. *See* 28 U.S.C. § 2254(e)(1).

The victim of the murder at issue in this case, Kevin Hamburg, sold marijuana out of his apartment in Centralia, Illinois, where he lived with his girlfriend, Amanda Hunt,

2

and her two daughters. (Docs. 14-1, pg. 1; 14-3, pg. 2). In the summer of 2008, Petitioner purchased marijuana from Hamburg through two acquaintances, Timothy Burton and Lloyd Finley. (Doc. 14-3, pg. 2). Petitioner told one acquaintance that he would rob the supplier if he "skimped" him on marijuana. (Doc. 14-3, pg. 2). Petitioner also asked Burton how much marijuana the supplier kept on hand and complained about the amount of marijuana that he was receiving from the supplier. (Doc. 14-3, pg. 2).

On the morning of September 10, 2008, Brittany Hohman drove Petitioner to Hamburg's apartment, where Petitioner bought marijuana. (Doc. 14-3, pg. 2). Later that day, Petitioner told an acquaintance, Jared Michael Queen, that he might rob Hamburg of his marijuana and, if necessary, "shoot him in his face." (Docs. 14-1, pg. 1; 14-3, pg. 2). That night, Hohman again drove Petitioner to Hamburg's apartment, where she thought Petitioner was going to buy more weed. (Docs. 14-1, pg. 1; 14-3, pg. 2). Petitioner's girlfriend, Erica Taylor, was also along for the ride. (Docs. 14-1, pg. 1; 14-3, pg. 2). Petitioner told Hohman to drop him off and "wait down the road." (Doc. 14-3, pg. 2). Petitioner entered Hamburg's apartment with a .25-caliber pistol. (Doc. 14-1, pg. 1).

Once inside Hamburg's apartment, Petitioner pulled his pistol and threatened to shoot Hamburg if he did not "give it to him." (Doc. 14-3, pg. 2). A struggled ensued between Petitioner, Hamburg, and Hunt. (Docs. 14-1, pg. 1; 14-3, pg. 2). Hunt pleaded with Petitioner "to please not do this." (Doc. 14-3, pg. 2). Hamburg pinned Petitioner against a wall and Hunt attempted to grab the pistol, resulting in Petitioner firing a bullet through the ceiling. (Doc. 14-3, pg. 2). As Hamburg and Hunt were attempting to force

Petitioner "out the door," Petitioner fired a second gunshot that struck Hamburg in the head, resulting in Hamburg's death. (Docs. 14-1, pg. 1; 14-3, pg. 2).

Petitioner fled the scene and called Hohman to pick him up "[a]bout a block down the road." (Docs. 14-1, pg. 1; 14-3, pgs. 2-3). Petitioner was out of breath and "looked kind of shook up" when he reentered the vehicle. (Docs. 14-1, pg. 1; 14-3, pgs. 2-3). Petitioner said he fired the gun but "didn't know if he hit anybody." (Docs. 14-1, pg. 1; 14-3, pgs. 2-3). Hohman dropped Petitioner and Taylor off at Taylor's mother's house. (Doc. 14-3, pgs. 2-3). Petitioner told Hohman, "keep [your] eyes and ears open." (Doc. 14-3, pgs. 2-3).

Back at Hamburg's apartment, Hunt and her 8-year-old daughter, who was in the hallway of the apartment during the struggle, were questioned by the police. (Doc. 14-3, pg. 3). Hunt informed the police that she recognized the shooter but did not know his name. (Doc. 14-3, pg. 3). Hunt also informed the police that Hamburg had "only associated with three black guys"—"D," "Terrell or Terreek," and "the other one…from Arkansas." Hunt indicated that the shooter was the last person to call Hamburg's cellphone, so she identified Petitioner's cell phone number as being the shooter's cell phone number. (Doc. 14-3, pg. 3). "Terrell or Terreek" had an alibi at the time of Hamburg's murder and Hunt, after being shown a photographic lineup that included a picture of "Terrell or Terreek," cleared him of being the shooter. (Doc. 14-3, pg. 3). When Hunt was shown a photographic lineup that included a picture of Petitioner, Hunt positively identified Petitioner as the shooter of Hamburg. (Doc. 14-3, pg. 3). Hunt also identified Petitioner as the shooter of Hamburg at trial. (Doc. 14-3, pg. 3).

4

Shortly after the shooting, Petitioner left Centralia via a train to Memphis, Tennessee. (Docs. 14-1, pg. 1; Doc. 14-3, pg. 3). Before doing so, Petitioner visited Queen, to whom Petitioner stated he had to "get ghost for a little while." (Doc. 14-3, pg. 3). Petitioner asked Queen to take a bag of .25-caliber bullets, but Queen refused to do so. (Doc. 14-3, pg. 3). The next morning, Petitioner's ex-girlfriend, Pamela Hill, picked him up from the train station. (Doc. 14-3, pg. 3). Hill drove Petitioner to Arkansas. (Docs. 14-1, pg. 1; 14-3, pg. 3). Petitioner then called Hohman, who informed Petitioner that Hamburg was dead. (Doc. 14-3, pg. 3). Petitioner again told Hohman to keep her eyes and ears open and to let him know what was going on. (Doc. 14-3, pg. 3). The State confirmed, via phone records, that Petitioner repeatedly called Hohman before and after Hamburg's murder. (Docs. 14-1, pgs. 3-4; 14-3, pg. 4). The phone records also confirmed that Petitioner called Hamburg minutes before the shooting and Hohman minutes after the shooting. (Doc. 14-3, pg. 4). The night after the murder, Hohman gave Taylor a ride "out of town," where Taylor "dumped" Petitioner's pistol and bullets off a bridge. (Docs. 14-1, pg. 1; 14-3, pg. 3). The police recovered clothing belonging to Petitioner, which Taylor had tried to burn, in Centralia. (Doc. 14-3, pg. 3). When in Arkansas, Petitioner convinced Hill to "start new" with him in Oklahoma City, Oklahoma, where Petitioner was eventually apprehended by United States Marshals. (Docs. 14-1, pg. 1; 14-3, pg. 3).

After his arrest and extradition, Petitioner agreed to speak with investigators of the Centralia Police Department and was read his rights under *Miranda v. Arizona. See* 384 U.S. 436 (1966); (Docs. 14-1, pg. 1; 14-3, pg. 3). Petitioner denied knowing about the events at Hamburg's apartment and claimed he left Centralia after his "life was threatened" by

5

a Chicago drug dealer named "June." (Docs. 14-1, pg. 1; 14-3, pg. 3; 14-9, pgs. 3-4). The investigators were "convinced" Petitioner shot Hamburg and insisted that he tell his "side of the story." (Docs. 14-1, pgs. 1, 3; 14-9, pg. 6). The investigators indicated that they spoke with various witnesses, including Hohman and Taylor, and knew what happened at the apartment. (Docs. 14-1, pgs. 1, 3; 14-3, pg. 3). About 12 minutes into the interview, which lasted 30 minutes total, Petitioner had the following exchange with investigators:

"[Detective 1]: How did it go down?

[Petitioner]:   I want a lawyer cause ya'll got me messed up for real.

[Detective 2]: Okay.

[Petitioner]: Now I'm not gonna sit up here and make myself look bad over. For one Brittany [Hohman] don't like me. I'm not gonna sit up here and compete where I want a lawyer. I didn't shoot nobody. I'm the one that's being in jeopardy. And just because I had to leave, I mean that really do look like I done something, but no, no sir, no sir. Me shoot him, no sir. No sir. No sir. You know I don't appreciate that for real because of what Brittany said. Brittany triflin. Brittany got some dude drivin my home boy car. You know. Brittany triflin period.

[Detective 2]: She ain't the only one.

[Petitioner]: I mean.

[Detective 2]: No.

[Petitioner]: She ain't the only one that said[,] I mean I don't care who said it really. It's my thing with Brittany [Hohman], cause me and Brittany

6

we always just feud for no reason, and now it's making me upset cause this

is a serious matter[,] you know[,] and I can't just sit here and let ya'll make

me look stupid and just say something that ain't true. You're trying to make

it seem like I'm lying or something. I'm sorry. My life was in jeopardy you

know. These dudes been trying to get at me for like so long[,] you know[,]

and no I'm not gonna fixin to just sit up here and just—

[Detective 2]: Like we said[,] we come to give you a chance. This is

the chance we gave you.

[Petitioner]: I appreciate it.

[Captain]: You got some attorney that you would like to call?"

(Docs. 14-1, pgs. 1, 3; 14-9, pgs. 7-8). Petitioner indicated that he did not have an attorney

to call. (Doc. 14-9, pg. 8). He was asked if he was "gonna need a court appointed

attorney." (Doc. 14-9, pg. 8). Petitioner indicated he did not want a court-appointed

attorney. (Doc. 14-9, pg. 8). Petitioner then stated, "my attorney is in Arkansas." (Doc. 14-

9, pg. 8). The investigators inquired "who would that be" and Petitioner responded, "my

Uncle." (Doc. 14-9, pg. 8). Petitioner suggested he did not know how to contact his uncle.

(Docs. 14-1, pg. 3; 14-9, pg. 8). The investigators and Petitioner discussed how he could

contact his uncle. (Doc. 14-9, pg. 9). The investigators reiterated that they wanted to hear

his "side of the story." (Docs. 14-1, pg. 3; 14-9, pg. 9). Petitioner stated he left Centralia

because his "life was threatened." (Docs. 14-1, pg. 3; 14-9, pg. 9). The investigators then

said, in back-to-back statements, "we're at the point here [where] you said you think you

need an attorney so we really can't question you" and "[w]e can't go any further unless

you're willing to talk further. I mean if you got an attorney you want to call that's fine. You know, if you got one you want to call, any attorney, local or out of state." (Doc. 14-9, pg. 9). Petitioner, unresponsively, stated "Main dude's name is June. He's 44 years old." (Doc. 14-9, pg. 9). An investigator immediately stated, "Well just let me ask you this Anthony, is there an attorney that you want to call right now?" (Doc. 14-9, pg. 10). Petitioner responded, "I don't—no no." (Doc. 14-9, pg. 10). He also indicated "All I know is my family" and "I can't afford nobody here." (Doc. 14-9, pg. 10). The investigators then twice asked Petitioner if they could "continue to talk." (Docs. 14-1, pg. 3; 14-9, pg. 10). Petitioner responded, "I would love to talk to all ya" and "Go ahead." (Docs. 14-1, pg. 3; 14-9, pg. 10). The investigators continued the interview. (Docs. 14-1, pg. 3; 14-9, pg. 10).

Petitioner and the investigators discussed Petitioner's phone usage and records. (Doc. 14-9, pgs. 10-11, 17-18). Petitioner claimed he was innocent and not a killer. (Docs. 14-1, pg. 1; 14-9, pgs. 12, 22). Petitioner denied speaking to Hohman or Taylor on the day of Hamburg's murder. (Docs. 14-1, pgs. 1, 4-5; 14-3, pg. 3; 14-9, pgs. 15, 17, 22). Petitioner suggested Hohman was making him look bad and the reason he was the suspected shooter. (Docs. 14-3, pg. 3; 14-9, pgs. 15-17). Petitioner again stated he wanted a lawyer and was "ready to go to court." (Doc. 14-9, pg. 22). Petitioner continued by stating he was not a killer, would "fight" the allegations, and was ready to return to his cell. (Doc. 14-9, pg. 22). The interview concluded and petitioner returned to his cell. Thereafter, Petitioner filed a motion to suppress his statements, which was denied. (Doc. 14-1, pg. 1).

Petitioner was incarcerated at the Clinton County Jail while awaiting trial. (Docs. 14-1, pg. 2; 14-3, pg. 3). Louis Lawson, who was also incarcerated at the Clinton County

Jail, testified that Petitioner stated he "tussled" with a guy while trying to rob him of "weed." (Docs. 14-1, pg. 2; 14-3, pg. 3). Petitioner told Lawson he "ended up shooting" the guy. (Doc. 14-1, pg. 2). A second inmate, Charles Lewis, testified that Petitioner stated he shot a man in the head in what was "like a drug deal that went bad" and he "almost got away with it." (Doc. 14-1, pg. 2; 14-3, pg. 3). A third inmate, Devon Smith, stated Petitioner claimed "he didn't do it," but was "worried" after the investigators collected hair samples from Petitioner. (Doc. 14-3, pg. 4). Smith also heard Petitioner accuse Taylor of "talking on him." (Doc. 14-3, pg. 4). A fifth inmate, incarcerated with Taylor, heard Petitioner tell Taylor, "[Y]ou snitched on me, bitch." (Doc. 14-3, pg. 3).

Before his trial, Petitioner hired a private investigator. (Doc. 14-3, pg. 4). The private investigator canvassed Hamburg's neighborhood and interviewed several potential witnesses, including Patricia Phillips, who lived approximately three blocks from Hamburg's apartment. (Doc. 14-3, pg. 4). Petitioner named Phillips as a potential witness and provided the State with a summary of her interview with the private investigator. (Doc. 14-3, pg. 4).[1] The State sought to bar Phillips from testifying. (Doc. 14-3, pg. 4). At a hearing, the parties agreed Phillips would testify that, while walking her dog on the night of Hamburg's murder, she saw a black male, wearing a dark hoodie, do-rag, and white tennis shoes, running near Hamburg's apartment. (Doc. 14-3, pg. 4). Phillips noticed the same black male in the area two nights later, when Petitioner was in Arkansas. (Doc. 14-3, pg. 4). The State argued Phillips' proposed testimony was

---

[1] The interview summary was not part of the record on appeal in *Jackson II*. (Doc. 14-3, pg. 4).

speculative and failed to establish a connection to Hamburg's murder. (Doc. 14-3, pg. 4). Petitioner argued the police never interviewed Phillips, indicating a shoddy investigation and that "Terrell or Terreek" was the murderer. (Doc. 14-3, pg. 4). The trial court granted the State's motion *in limine*, barring Phillips from testifying at trial. (Doc. 14-3, pg. 4).

On September 25, 2009, the jury found Petitioner guilty of first-degree murder. (Doc. 14-1, pg. 2). He was sentenced to 40 years in prison. (Docs. 14-1, pg. 2; 14-3, pg. 4).

### 2. Petitioner's Direct Appeal

Petitioner appealed the Illinois trial court's judgment and conviction to the Illinois Appellate Court, Fifth District. Petitioner argued only that the Illinois trial court erred by denying his motion to suppress because Petitioner's statements were made during a custodial interrogation after he requested, but did not receive, legal counsel. (Docs. 1, pgs. 2-3; 14-1, pgs. 6-7, 33). On December 7, 2011, the Illinois Appellate Court, Fifth District, affirmed the judgment and conviction. *See Jackson I*, 2011 IL App (5th) 100181-U; (Doc. 14-1). Petitioner filed a *pro se* petition for leave to appeal to the Supreme Court of Illinois, again arguing that the Illinois trial court erred by denying his motion to suppress.[2] The Supreme Court of Illinois denied Petitioner's petition for leave to appeal. *See id.*, *leave to appeal denied*, 968 N.E.2d 85 (Ill. March 28, 2012) (No. 113727); (Doc. 14-3, pg. 1).

### 3. Petitioner's Second Amended Petition for Postconviction Relief

On August 24, 2012, Petitioner filed a *pro se* petition for postconviction relief in the Illinois trial court. Thereafter, the Illinois trial court appointed counsel for Petitioner, who

---

[2] Also, for the first time, Petitioner argued he received ineffective assistance of counsel due to trial and appellate counsel's failure to challenge Hunt's identifications of Petitioner, which he argued were unreliable and uncorroborated by Hunt's 8-year-old daughter.

on March 8, 2013, filed a second amended petition for postconviction relief, alleging: (1) Appellate counsel failed to challenge the identification testimony of Hunt in Petitioner's direct appeal (Docs. 1, pg. 4; 14-3, pg. 25); (2) Appellate counsel failed to argue, on direct appeal, that Petitioner received ineffective assistance of trial counsel due to the failure to call Taylor as an alibi witness (Docs. 1, pg. 4; 14-3, pg. 26); (3) Appellate counsel failed to challenge, on direct appeal, the Illinois trial court's grant of the State's motion *in limine*, which barred Phillips's testimony at trial (Doc. 14-3, pg. 26); (4) Appellate counsel failed to challenge, on direct appeal, the significance of the fact that the hair fragments found on Hamburg did not match Petitioner's hair samples (Docs. 1, pg. 4; 14-3, pg. 26); and (5) The testimony of Phillips and Taylor, who were not called to testify at trial, would now prove Petitioner is innocent. (Docs. 1, pg. 4; 14-3, pg. 26).

Petitioner's second amended petition for postconviction relief was dismissed by the Illinois trial court at the second stage of the postconviction proceedings. (Docs. 1, pg. 4; 14-3, pg. 2). The Illinois Appellate Court, Fifth District, affirmed the dismissal on March 30, 2018. *See Jackson II*, 2018 IL App (5th) 150090-U; (Doc. 14-3). In that appeal, Petitioner argued only that he received ineffective assistance of counsel in his direct appeal because appellate counsel did not challenge the grant of the State's motion *in limine*, which barred Phillips's testimony. (Doc. 14-4, pg. 42). Petitioner filed a *pro se* petition for leave to appeal to the Supreme Court of Illinois, which was denied. (Doc. 14-4, pgs. 25, 51).

## Analysis

The Court's authority to issue habeas corpus relief for a person in state custody, such as Petitioner, derives from 28 U.S.C. § 2254, as amended by the Antiterrorism and

Effective Death Penalty Act of 1996. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011). Under § 2254, the Court shall entertain a petition for a writ of habeas corpus on behalf of a person in custody pursuant to a state-court judgment only on the ground that he or she is in custody in violation of the Constitution or the laws or treaties of the United States. *See* 28 U.S.C. § 2254(a). A petition for writ of habeas corpus shall not be granted with respect to any claim, adjudicated on the merits, unless the adjudication of the claim: (1) resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See id.* § 2254(d).

A decision is "contrary to…clearly established federal law" if the rule applied differs from the law set forth by Supreme Court precedent. *See Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A decision "involve[s] an unreasonable application of clearly established federal law" if the decision correctly identifies, but unreasonably applies, the rule of law to the facts of the case. *See id.* (citing *Williams v. Taylor*, 529 U.S. 362, 407 (2000)). The "operative decision" to be reviewed is that of the last state court to reach the merits of the claim. *See Stechauner v. Smith*, 852 F.3d 708, 714 (7th Cir. 2017) (quoting *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012)).

A state court's finding that a claim is meritless precludes federal habeas corpus relief under § 2254(d) if "fairminded jurists" could disagree about whether the decision was correct. *See Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). This Court asks whether arguments or theories supported or could have

supported the state court's decision, such that "fairminded jurists" could disagree about whether the arguments or theories are inconsistent with a Supreme Court decision. *Id*. at 102; *accord Winfield v. Dorethy*, 871 F.3d 555, 560 (7th Cir. 2017). Put another way, the state court's ruling must be so lacking in justification that the error was "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103; *accord Smith v. Boughton*, 43 F.4th 702, 708 (7th Cir. 2022).

Further, a conviction may be upheld notwithstanding a constitutional error if it was harmless beyond a reasonable doubt. *See U.S. v. Lee*, 618 F.3d 667, 673 (7th Cir. 2010) (citing *U.S. ex rel. Savory v. Lane*, 832 F.2d 1011, 1016 (7th Cir. 1987)). Such an error is harmless when the State can prove that the error did not contribute to the verdict. *Id*. (citing *Hunter v. Clark*, 934 F.2d 856, 859 (7th Cir. 1991)); *accord U.S. v. Hernandez*, 948 F.2d 316, 324 (7th Cir. 1991). The Court must decide whether there is a reasonable possibility that the constitutional error contributed to the conviction, meaning "honest and fairminded jurors" might have returned a not-guilty verdict in the absence of the constitutional error. *See Hernandez*, 948 F.2d at 324 (quoting *U. S. ex rel. Ross v. Fike*, 534 F.2d 731, 734 (7th Cir. 1976); *Mauricio v. Duckworth*, 840 F.2d 454, 459 (7th Cir. 1988)); *accord Lane*, 832 F.2d at 1019-20. Other evidence of guilt must usually be overwhelming before a court will conclude that the constitutional error was harmless. *See Hernandez*, 948 F.2d at 324 (quoting *Mauricio*, 840 F.2d at 459); *accord Lane*, 832 F.2d at 1019-20.

Notably, a strong case for relief does not necessarily result in a conclusion that the state court's contrary decision was unreasonable. *See Harrington*, 562 U.S. at 102; *accord Cal v. Garnett*, 991 F.3d 843, 850 (7th Cir. 2021). The standard applicable to § 2254(d) is

meant to be difficult, as that provision preserves the authority to issue a writ of habeas corpus only if "there is no possibility fairminded jurists could disagree" about whether the decision conflicts with Supreme Court precedent. *Harrington*, 562 U.S. at 102; *accord Cal*, 991 F.3d at 849-50. In this way, § 2254(d) "is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)); *accord Smith*, 43 F.4th at 708. With these principles in mind, the Court proceeds to a consideration of Petitioner's claims.

### 1. The Illinois Trial Court's Denial of Petitioner's Motion to Suppress

Petitioner argues the investigators violated his constitutional rights by continuing a custodial interrogation after he requested legal counsel. (Doc. 16, pg. 3). Petitioner argues this constitutional violation was not harmless because "the State used the illegally obtained statement[s] to introduce 'Flight evidence,' among other statements, that the jury may have inferred as consciousness of guilt for the crime charged." (Doc. 16, pg. 4).

Relevantly, "special protections apply" once a suspect has invoked the right to counsel during a custodial interrogation. *See U.S. v. Straker*, 800 F.3d 570, 622 (D.C. Cir. 2015). If that right was invoked by the suspect, then the court may admit the suspect's responses to additional questioning by the police officers only if the suspect (1) initiated further discussions with the police officers and (2) knowingly and intelligently waived the previously invoked right to counsel. *See U.S. v. Wysinger*, 683 F.3d 784, 793 (7th Cir. 2012) (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984)); *see also Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (stating a suspect, who invokes the right to counsel during a custodial

interrogation, cannot be subjected to interrogation until an attorney is made available, unless the suspect initiates further communication, exchanges, or conversations with the police officers); *accord Straker*, 800 F.3d at 622. It is insufficient that the suspect was advised of the right to counsel yet responded to the additional interrogation. *See Shatzer*, 559 U.S. at 104 (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)); *accord Wysinger*, 683 F.3d at 793; *Straker*, 800 F.3d at 622. This rule is grounded in the notion that once a suspect indicates he or she is incapable of undergoing a custodial interrogation in the absence of an attorney, a subsequent waiver of the right to counsel, at the behest of the authorities and not the suspect's own instigation, is a product of inherently compelling pressures rather than the suspect's sole voluntary choice. *See Shatzer*, 559 U.S. at 104-05 (quoting *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)); *accord Straker*, 800 F.3d at 622.

Here, the "operative decision" under review is that of the Illinois Appellate Court, Fifth District, when affirming the judgment and conviction of Petitioner. *See Stechauner*, 852 F.3d at 714; *Jackson I*, 2011 IL App (5th) 100181-U; (Doc. 14-1). In *Jackson I*, the Illinois Appellate Court, Fifth District, concluded Petitioner initiated further conversation with the investigators after invoking the right to counsel, then knowingly and intelligently waived the right to counsel for the remainder of the interview. *Jackson I*, 2011 IL App (5th) 100181-U, ¶¶ 17-18; (Doc. 14-1, pg. 3). For these reasons, the Illinois Appellate Court, Fifth District, found Petitioner's statements during the interview with investigators were admissible, such that the Illinois trial court properly denied his motion to suppress. *Jackson I*, 2011 IL App (5th) 100181-U, ¶ 18; (Doc. 14-1, pg. 3). The Illinois Appellate Court, Fifth District, also noted that, even if Petitioner's statements should have been

suppressed, the request for a new trial would have been denied because any resulting error was harmless. *Jackson I*, 2011 IL App (5th) 100181-U, ¶ 19; (Doc. 14-1, pgs. 3-4).

Following a careful review, the Court concludes the decision of the Illinois Appellate Court, Fifth District, on review of the denial of Petitioner's motion to suppress, was not "contrary to or involve[] an unreasonable application of clearly established federal law." *See* 28 U.S.C. § 2254(d)(1); *Bailey*, 735 F.3d at 949. "Fairminded jurists" could disagree (or, more likely, agree) that decision was correct. *See Harrington*, 562 U.S. at 101-03; *Winfield*, 871 F.3d at 560. As support for this conclusion, the Court finds Petitioner invoked the right to counsel during the custodial interrogation by investigators, but then immediately initiated further discussions with the investigators by talking about, *inter alia*, Hohman, how he "didn't shoot nobody," and how he "had to leave" Centralia because his "life was in jeopardy." (Docs. 14-1, pgs. 1, 3; 14-9, pgs. 7-8). Petitioner then knowingly and intelligently waived the right to counsel by stating "I would love to talk to all ya" and "Go ahead." (Doc. 14-9, pgs. 7-10). This was after the investigators inquired about the need for a court-appointed attorney, discussed the ways in which Petitioner could contact his uncle, twice reminded Petitioner that the interview could not continue because he invoked the right to counsel, asked Petitioner whether he wanted an attorney, and twice asked Petitioner whether the interview could proceed. *See Wysinger*, 683 F.3d at 793; *see also Shatzer*, 559 U.S. at 104; *accord Straker*, 800 F.3d at 622; (Doc. 14-9, pgs. 7-10).

Even if this were not the case, the Court finds any constitutional error stemming from the admission of Petitioner's statements was harmless beyond a reasonable doubt. *See Lee*, 618 F.3d at 673. The Court agrees with the Illinois Appellate Court, Fifth District,

16

that Petitioner's statements during the custodial interrogation were not "inherently inculpatory." *See Jackson I*, 2011 IL App (5th) 100181-U, ¶ 19. Petitioner maintained his innocence and denied, albeit dishonestly, speaking to Hohman or Taylor on the day of Hamburg's murder. (Docs. 14-1, pgs. 1, 4-5; 14-3, pg. 3; 14-9, pgs. 12, 15, 17, 22). Therefore, the Court cannot conclude, in light of the evidence presented at trial, "honest and fairminded jurors" might have returned a not-guilty verdict absent the admitted statements. *See Hernandez*, 948 F.2d at 324; *Lane*, 832 F.2d at 1019-20. Aside from those statements, the State's evidence included, *inter alia*, Hunt's identifications of Petitioner as the shooter of Hamburg after being present in Hamburg's apartment, phone records indicating Petitioner called Hamburg minutes before the shooting and Hohman minutes after the shooting, testimony that Petitioner would rob Hamburg if he "skimped" him on marijuana, testimony that Petitioner complained about the amount of marijuana he was receiving from Hamburg, testimony that Petitioner might rob Hamburg and "shoot him in his face," testimony that Hohman drove Petitioner to Hamburg's apartment and witnessed him being "kind of shook up," testimony that Petitioner told Hohman and Taylor that he fired his gun but "didn't know if he hit anybody," testimony that Taylor "dumped" Petitioner's pistol and bullets off a bridge, and the testimony of various other prisoners that Petitioner spoke to before trial. *See supra* pgs. 3-5, 8-9. Clearly, the other evidence admitted by the State against Petitioner was overwhelming and proves beyond a reasonable doubt that the constitutional error now alleged did not contribute to the verdict. *See Hernandez*, 948 F.2d at 324; *Lee*, 618 F.3d at 673; *Lane*, 832 F.2d at 1019-20.

17

Therefore, the Court **FINDS** Petitioner is not entitled to habeas corpus relief under § 2254(d)(1) for the first claim stated in his Petition for Writ of Habeas Corpus.

### 2. Ineffective Assistance of Counsel For The Failure to Challenge the Illinois Trial Court's Grant of the State's Motion *In Limine.*

Next, Petitioner argues appellate counsel, in his direct appeal, was ineffective for failing to challenge the grant of the State's motion *in limine*, which precluded Phillips's testimony at trial. (Doc. 16, pg. 6). Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny of cases. The benchmark for such claims is whether counsel's conduct so undermined the proper functioning of the adversarial process that the proceeding cannot be relied upon to have produced a just result. *See id.* at 686-87; *accord Shannon v. United States*, 39 F.4th 686, 877 (7th Cir. 2022). To succeed on an ineffective assistance of counsel claim, the defendant must show: (1) counsel's performance was deficient, meaning counsel's errors were so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution; and (2) counsel's deficient performance prejudiced the defendant, such that counsel's errors were so serious that they deprived the defendant of a fair trial and a reliable result. *Strickland*, 466 U.S. at 687; *accord Shannon*, 39 F.4th at 877.

The first prong of the *Strickland* test requires a showing that counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88; *accord Shannon*, 39 F.4th at 877. There is a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *See Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). In the context of an appeal,

appellate counsel need only raise those arguments most likely to succeed, as opposed to every nonfrivolous argument. *See Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) (citing *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes*, 463 U.S. 745, 751-53 (1983)); *see also United States v. Valas*, 40 F.4th 253, 260 (5th Cir. 2022). As such, declining to raise a claim on appeal does not constitute deficient performance by appellate counsel unless it is "plainly stronger" than the claims presented to the appellate court. *See Davila*, 137 S. Ct. at 2067 (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)); *accord Lee-Kendrick v. Eckstein*, 38 F.4th 581, 589 (7th Cir. 2022); *Minnick v. Winkleski*, 15 F.4th 460, 471 (7th Cir. 2021).

The second prong of the *Strickland* test requires a showing that there is a reasonable probability, *i.e.*, a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different but for the unprofessional errors of the defendant's counsel. *Strickland*, 466 U.S. at 694; *accord Shannon*, 39 F.4th at 877. This requires more than "some conceivable effect on the outcome of the proceeding." *See Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). For an issue not raised on appeal, prejudice is established if the unraised issue may have resulted in a reversal or a new trial. *See Lee v. Davis*, 328 F.3d 896, 901 (7th Cir. 2003) (quoting *Winters v. Miller*, 274 F.3d 1161, 1167 (7th Cir. 2001)). These prongs must be considered in light of the totality of the evidence. *Shannon*, 39 F.4th at 877. If a defendant fails to satisfy either prong, then a court may dispose of the defendant's claim without considering the other prong. *See id*.

Now, the "pivotal question" is whether the Illinois court's ruling was "contrary to or involved an unreasonable application of" *Strickland* under § 2254(d)(1). *See Harrington*, 562 U.S. at 101; 28 U.S.C. § 2254(d)(1). To emphasize, the question of an "unreasonable

application of" *Strickland* is different from the question of whether counsel's performance fell below an objective standard of reasonableness under *Strickland. See Harrington*, 562 U.S. at 101. This is because an unreasonable application of *Strickland* and an incorrect application of *Strickland* are distinguishable under § 2254(d)(1). *See id.* (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)); *accord Jensen v. Clements*, 800 F.3d 892, 908 (7th Cir. 2015). Therefore, state courts "must be granted a deference and latitude [under § 2254(d)(1)] that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101; *accord Winfield*, 871 F.3d at 560. Further, the standards applicable to *Strickland* and § 2254(d) are "highly deferential," and review is " 'doubly' so" when the standards operate in tandem. *Harrington*, 562 U.S. at 103 (quoting *Strickland*, 466 U.S. at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Knowles v. Mirzayance*, 562 U.S. 86, 123 (2009)); *accord Sigmon v. Stirling*, 956 F.3d 183, 192 (4th Cir. 2020).

Here, the "operative decision" under review is that of the Illinois Appellate Court, Fifth District, when affirming the dismissal of Petitioner's second amended petition for postconviction relief. *See Stechauner*, 852 F.3d at 714; *Jackson II*, 2018 IL App (5th) 150090-U; (Doc. 14-3). In *Jackson II*, the Illinois Appellate Court, Fifth District, concluded the Illinois trial court acted within its discretion when granting the State's motion *in limine*, based on findings that Phillips's testimony was irrelevant and appellate counsel was not ineffective or unreasonable for failing to challenge the Illinois trial court's ruling. *Jackson II*, 2018 IL App (5th) 150090-U, ¶¶ 39-40; (Doc. 14-3, pg. 6). The Illinois Appellate Court, Fifth District, also concluded, even if Phillips's testimony was admissible, Petitioner's

conviction would have been affirmed since "he suffered no resulting prejudice" from that alleged error. *Jackson II*, 2018 IL App (5th) 150090-U, ¶ 41; (Doc. 14-3, pgs. 6-7).

After a careful review, the Court concludes the decision of the Illinois Appellate Court, Fifth District, to reject the ineffective assistance of appellate counsel claim related to the failure to challenge the grant of the State's motion *in limine*, was not "contrary to or involve[] an unreasonable application of clearly established federal law." *See* 28 U.S.C. § 2254(d)(1); *Bailey*, 735 F.3d at 949. As with Petitioner's first claim, "fairminded jurists" could disagree, or even agree, that decision was correct. *See Harrington*, 562 U.S. at 101-03; *Winfield*, 871 F.3d at 560. The Court finds this issue was not "plainly stronger" than the issue related to Petitioner's motion to suppress, as necessary to establish deficient performance. *See Davila*, 137 S. Ct. at 2067; *Lee-Kendrick*, 38 F.4th at 589; *Minnick*, 15 F.4th at 471. Phillips's prospective testimony, which was rejected by the Illinois trial court as irrelevant, would have only served to create speculation about another unidentified black male running in the vicinity of Hamburg's apartment around the time of Hamburg's murder. (Doc. 14-3, pg. 4). In other words, the prospective testimony of Phillips would not have, as Petitioner suggested, added probative value to the claims that the police conducted a "shoddy investigation" or that "Terrell or Terreek" was the murderer. (Doc. 14-3, pg. 4). The investigation resulted in overwhelming evidence that Petitioner murdered Hamburg and "Terrell or Terreek" had an alibi at that time. (Doc. 14-3, pg. 3). Also, "Terrell or Terreek" was cleared of being the murderer by Hunt. (Doc. 14-3, pg. 3).

Moreover, the Court finds, even if the issue should have been raised on direct appeal, Petitioner did not suffer prejudice from appellate counsel's alleged deficient

performance. *See Strickland*, 466 U.S. at 687; *Shannon*, 39 F.4th at 877. In view of the overwhelming evidence admitted against Petitioner by the State, which is discussed extensively in this Memorandum and Order, the Court cannot conclude that the outcome of Petitioner's direct appeal would have resulted in a reversal or a new trial if appellate counsel had challenged the grant of the State's motion *in limine*. *See Davis*, 328 F.3d at 901. For these reasons, the Court concludes the Illinois Appellate Court, Fifth District, could properly find Petitioner's appellate counsel was effective in his direct appeal.

Therefore, the Court **FINDS** Petitioner is not entitled to habeas corpus relief under § 2254(d)(1) for the second claim stated in his Petition for Writ of Habeas Corpus.

### 3. Petitioner's Other Claims.

Petitioner's other claims relate to the alleged ineffective assistance of appellate counsel for the failure to challenge the witness identifications of Hunt, the ineffective assistance of trial counsel for the failure to call Taylor as an alibi witness at trial, and the fact that the hair fragments found on Hamburg did not match the hair samples of Petitioner. Before reaching the merits, the Court must ensure Petitioner has overcome two procedural hurdles, namely, exhaustion and procedural default. *See Spreitzer v. Schomig*, 219 F.3d 639, 644 (7th Cir. 2000) (citing *Henderson v. Thieret*, 859 F.2d 492, 496 (7th Cir. 1988)); *see also* 28 U.S.C. § 2254(b)(1)(A). Section 2254(b)(1)(A) states a petition for writ of habeas corpus shall not be granted unless a petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). A petitioner cannot satisfy this requirement if he or she has the right under state law to raise, by any available procedure, the question presented in federal habeas corpus proceedings. *See id*. § 2254(c).

Therefore, a petitioner has a duty to "fairly present" his or her federal claims in the state court, which means a petitioner, either on direct appeal or in postconviction proceedings, must assert the federal claims in "one complete round of state-court review." *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004) (citing *Baldwin v. Reese*, 541 U.S. 27, 124 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971)). A "complete round of state-court review" means the claims were raised "at each and every level in the state court system, including levels at which review [wa]s discretionary rather than mandatory." *Id.* at 1025-26 (citing *O'Sullivan*, 526 U.S. at 845)); *see also U.S. ex rel. Jones v. Uchtman*, 387 F. Supp. 2d 856, 863-64 (N.D. Ill. 2005) (stating, in Illinois, a "complete round of state-court review" is review by the Illinois Appellate Court and at least a petition for review by the Supreme Court of Illinois).

It is not enough that the facts necessary to support a claim were before the state court or that the petitioner raised a similar state law claim. *See Momient-El v. DeTella*, 118 F.3d 535, 539 (7th Cir. 1997) (quoting *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)). Instead, both the operative facts and the controlling legal principles must be presented to the state court. *See id.* (quoting *Verdin*, 972 F.2d at 1474). If a petitioner exhausts his or her state court remedies without raising claims in a "complete round of state-court review," then the claims are procedurally defaulted. *Lewis*, 390 F.3d at 1026 (citing *O'Sullivan*, 526 U.S. at 848-49; *Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir. 1999); *Momient-El*, 118 F.3d at 541)). Procedural default bars habeas corpus relief unless a petitioner can show cause for and prejudice from the procedural default, or that a denial of habeas corpus relief will

result in a miscarriage of justice. *Id*. at 1026 (citing *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986)).

Here, none of Petitioner's three remaining claims were presented to the Illinois Appellate Court, Fifth District, in either his direct appeal or the appeal from the dismissal of his second amended petition for postconviction relief. (Docs. 1, pgs. 2-3; 14-1, pgs. 6-7, 33; 14-4, pg. 42). As a result, Petitioner failed to "fairly present" those three remaining claims in "one complete round of state-court review." *See Lewis*, 390 F.3d at 1025-26; *Uchtman*, 387 F. Supp. 2d at 863-64. Therefore, the Court finds Petitioner's three remaining claims are procedurally defaulted. *See Lewis*, 390 F.3d at 1025-26. Further, Petitioner has not shown cause for and prejudice from the procedural default, or that a denial of habeas corpus relief in this case will result in a miscarriage of justice. *See id*. at 1026.

For these reasons, the Court **FINDS** Petitioner's three remaining claims for habeas corpus relief are procedurally defaulted.

## Certificate of Appealability

If a petitioner's detention arises out of the process issued by a State court, as is the case under § 2254, then an appeal may not be taken from the final order in that proceeding unless the Court issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A). Therefore, the Court must issue or deny a certificate of appealability when entering a final order that is adverse to a petitioner. *See* Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts. A certificate of appealability may issue under § 2253(c)(1) only if the petitioner made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). A petitioner must show that reasonable

jurists could debate or even agree on the question of whether the petition for writ of habeas corpus should have been resolved differently or that the issues presented adequately deserved encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *accord Brown v. Brown*, 847 F.3d 502, 515 (7th Cir. 2017). Similarly, if a petitioner's claims are dismissed on procedural grounds without consideration of the merits, then he or she must demonstrate that jurists of reason would find it debatable whether the petitioner stated a valid claim for the denial of a constitutional right and that the district court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *accord Peterson v. Douma*, 751 F.3d 524, 530-31 (2014). Section 2253(c) requires an overview and general assessment of the merits of the claims. *See Miller-El*, 537 U.S. at 336. However, the threshold inquiry by the Court does not require full consideration of the factual or legal bases that support the petitioner's claims. *See id.*; *accord Brown*, 847 F.3d at 515.

Here, the Court concludes no reasonable jurist would debate whether the rulings on the substantive issues or of procedural default were correct. *See Miller-El*, 537 U.S. at 336; *Brown*, 847 F.3d at 515. As such, the Court **DENIES** a certificate of appealability. Petitioner may reapply for a certificate of appealability with the United States Court of Appeals for the Seventh Circuit. *See* Fed. R. App. P. 22(b); 28 U.S.C. § 2253(c)(1).

### Conclusion

For the foregoing reasons, Petitioner's Petition for Writ of Habeas Corpus is **DENIED** and the action is **DISMISSED with prejudice**. The Clerk is **DIRECTED** to enter judgment accordingly. If Petitioner wishes to appeal the dismissal of this action, then he must file a notice of appeal in this Court within 30 days of the entry of judgment. *See*

R. App. P. 4(a)(1)(A). A motion for leave to appeal *in forma pauperis* must satisfy the requirements of Federal Rule of Appellate Procedure 24(a)(1). *See* Fed. R. App. P. 24(a)(1)(C). If Petitioner appeals and is allowed to proceed *in forma pauperis*, then he is liable for a portion of the $505 appellate filing fee, as determined from his prison trust fund account records for the past six months, regardless of the outcome on appeal. *See* Fed. R. App. P. 3(e); 28 U.S.C. § 1915(a)(1)-(2), (b); *Ammons v. Gerlinger*, 547 F.3d 724, 725-26 (7th Cir. 2008); *Sloan v. Lesza*, 181 F.3d 857, 858-59 (7th Cir. 1999); *Lucien v. Jockisch*, 133 F.3d 464, 467 (7th Cir. 1998). A motion filed pursuant to Federal Rule of Civil Procedure 59(e) may toll the 30-day deadline to appeal. *See* Fed. R. App. P. 4(a)(4); Fed. R. Civ. P. 59(e). Such a motion must be filed within 28 days of the entry of judgment. *See* Fed. R. Civ. P. 59(e). Other motions, such as a motion for relief from a final judgment under Federal Rule of Civil Procedure 60(b), do not toll the deadline for filing an appeal. *See* Fed. R. Civ. P. 60(b); *Textile Banking Co., Inc. v. Rentschler*, 657 F.2d 844, 849 (7th Cir. 1981).

**SO ORDERED.**

Dated: September 16, 2022

_____
DAVID W. DUGAN
United States District Judge